2019 IL App (1st) 191886-U

FIRST DISTRICT
SECOND DIVISION
July 21, 2020

No. 1-19-1886

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| MARK WAGNER | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| | ) | |
| v. | ) | No. 17 L 63096 |
| | ) | |
| BELLE LIND GORDON, Individually, and | ) | The Honorable |
| THE LAW OFFICES OF BELLE LIND GORDON, P.C. | ) | Martin S. Agran, |
| | ) | Judge Presiding. |
| Defendants-Appellees. | ) | |
| | ) | |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held:*  Trial court properly granted summary judgment in favor of defendant. Plaintiff failed to raise any issues of material fact regarding proximate cause.

¶ 2    Plaintiff Mark Wagner (plaintiff) filed a complaint against defendants Belle Lind Gordon (Gordon or defendant) and the Law Offices of Belle Lind Gordon (collectively referred to as "defendants") for breach of contract and legal malpractice. Plaintiff alleged that defendants' negligent representation caused him to incur boarding school expenses and various other costs and

1

fees associated with his underlying custody dispute with his ex-wife. Following the completion of discovery, defendants filed a motion for summary judgment, arguing that plaintiff could not establish the element of proximate cause, which the trial court granted. On appeal, plaintiff contends that that trial court erred in granting defendants' motion for summary judgment and denying plaintiff's request to submit an expert affidavit in response to defendants' motion. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4        During their marriage, plaintiff and his ex-wife, Nancy Wagner ("Nancy"), had one child, Matthew Wagner ("Matthew"). In 2011, Nancy initiated divorce proceedings, and custody of Matthew became a contested issue. Ultimately, the parties agreed that Nancy would reside in the marital residence in Evanston, Illinois and have primary residential custody of Matthew, and plaintiff would reside in the family farmhouse in Franklin Grove, Illinois and have liberal parenting time with Matthew. The trial court entered an Agreed Custody Judgment on July 21, 2014.

¶ 5        On March 30, 2015, Nancy filed a "Motion to Suspend Parenting Time and Re-Designate Therapist for Minor Child, to Appoint Child Representative and for Other Relief." On July 31, 2015, plaintiff retained Gordon to represent him in the post-decree custody proceedings.

¶ 6        At the end of plaintiff's August 17, 2015 visitation weekend with Matthew, he notified Nancy that Matthew had locked himself in his bedroom and was refusing to return home to Evanston. Nancy contacted the local police, who met her at plaintiff's home, but Matthew still refused to come home with her.

¶ 7        On August 18, 2015, Nancy filed an "Emergency Petition for Return of the Minor Child and to Suspend Parenting Time." Nancy alleged that plaintiff had a history of alienating Matthew from her, necessitating police intervention on multiple occasions. At the hearing, the court ordered

2

plaintiff to return Matthew to Nancy, but did not suspend plaintiff's parenting time. When plaintiff had not returned Matthew by the next day, Gordon e-mailed him "to let the police take [Matthew] or let Nancy take him or you are going to get arrested or taken into custody."

¶ 8      On August 20, 2015, Nancy filed an "Emergency Motion for Body Attachment." The court declined this request, but again ordered plaintiff to return Matthew to Nancy. The court also appointed attorney Howard Rosenberg to serve as a child representative for Matthew.[1]

¶ 9      On August 31, 2015, a hearing was held on Nancy's motion to suspend plaintiff's parenting time. On September 8, 2015, the court determined that contact with plaintiff was endangering Matthew's welfare pursuant to section 607(a) of the Illinois Marriage and Dissolution of Marriage Act (the Act). 750 ILCS 5/607(a) (West 2014). In so doing, the court relied on Matthew's February 2013 604(b) custody evaluation, which raised concerns about plaintiff's relationship with Matthew from Matthew's clinical psychologist, his guardian *ad litem*, and the 604(b) evaluator. The court also cited several e-mails that plaintiff had sent to Nancy and others, claiming that Matthew had been in crisis for several years because of his mother's actions. Finally, noting that Matthew was still not attending high school, the court "suspend[ed] [plaintiff's] parenting time, including any electronic communication, with his son . . . until such time as [Matthew] is back in Evanston High School . . . [i]f Matthew does not go back to Evanston High school, then we are going to be looking at boarding school, the cost of which is to be borne entirely by his father."

¶ 10      At a hearing conducted on August 22, 2016, the court was advised that Matthew had not attended high school in almost a year. Matthew was ordered to attend boarding school at plaintiff's expense. Plaintiff appealed and, in an earlier order, we affirmed the trial court. *Wagner v. Wagner*,

---

[1] A prior order appointing Dorothy Johnson as Matthew's child representative was vacated because she had previously served as the guardian ad litem in the case.

¶ 11    On September 8, 2017, plaintiff initiated the instant legal malpractice action against Gordon, alleging, *inter alia*, that "some time [sic] between August 15 and August 17, 2015, [she] told [plaintiff] not to allow or return [Matthew] to Nancy . . .". Plaintiff argued that Gordon's negligent advice was the proximate cause of his damages, to wit: attorney's fees, guardian *ad litem* fees, child representative fees, Matthew's boarding school fees, medical and therapy bills, penalties for early retirement withdrawals, and other miscellaneous fees and expenses. Defendants moved for summary judgment on grounds that plaintiff's alleged damages were not proximately caused by Gordon's actions. The court held that "[b]ased on the proceedings and reports it is evident nothing done by [d]efendant, or which could have been done by [d]efendant, would have changed the results."

¶ 12                                          ANALYSIS

¶ 13    On appeal, plaintiff argues that genuine issues of material fact exist as to whether Gordon was the proximate cause of his alleged damages. Appellate review of an order granting summary judgment is *de novo*. *Radtke v. Murphy*, 312 Ill. App. 3d 657, 662 (2000). Summary judgment is proper when the pleadings, depositions, and affidavits on file, construed in the light most favorable to the nonmoving party, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018); *Id.* "Although summary judgment can aid in the expeditious disposition of a lawsuit, it remains a drastic means of disposing of litigation and, therefore, should be allowed only where the right of the moving party is clear and free from doubt. *Coole v. Central Area Recycling*, 384 Ill. App. 3d 390, 395 (2008) (quoting *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008)). However, "if the plaintiff fails to establish any element of the cause of action, summary judgment for the defendant is

proper." *Id.* We may affirm a trial court's grant of summary judgment on any basis appearing in the record. *Id.* at 396.

¶ 14        To prevail in a legal malpractice action, the complainant must demonstrate that an attorney/client relationship existed, that a duty arose from that relationship, that the defendant breached that duty, and that complainant suffered actual damages as a proximate cause of the breach. *Id*. Even if negligence on the part of the attorney is established, no legal malpractice action exists unless the plaintiff establishes that but for the attorney's purported negligence, plaintiff would have been successful in the underlying action. *Tri-G, Inc. v. Burke, Bosselman &* Weaver, 222 Ill. 2d 218, 226 (2006). A legal malpractice plaintiff must therefore litigate a case within a case. *Id.*

¶ 15        Although the non-moving party need not prove his case at the summary judgment stage, he must come forth with some evidence that arguably would entitle him to recover at trial. *Keating v. 68th & Paxton, L.L.C.*, 401 Ill. App. 3d 456, 472 (1st Dist. 2010). To establish proximate cause, the plaintiff bears the burden of affirmatively and positively showing that the defendant's alleged negligence caused the injuries for which the plaintiff seeks to recover. *Id.* Although the issue of proximate cause is ordinarily determined by the trier of fact, it is well settled that it may be determined as a matter of law where the facts alleged show that the plaintiff would never be entitled to recover. *Elam v. O'Connor & Nakos, Ltd.*, 2019 IL App (1st) 181123. Moreover, where proximate cause turns on the question of how a court would have ruled on a particular legal issue in the absence of the alleged malpractice, the issue should be decided by the court. See *Brummel v. Grossman*, 2018 IL App (1st) 170516, ¶ 57 (whether trial court would have denied opponent's motion for summary judgment if defendant's attorney had adequately conducted discovery and

responded to the motion).

¶ 16     A parent not granted custody of a child is entitled to reasonable visitation rights unless the custodial parent proves, by a preponderance of the evidence, that without a restriction of visitation, the child's physical, mental, moral or emotional health will be seriously endangered. 750 ILCS 5/607(a) (West 2014)[2]; *In re K.E.B.,* 2014 IL App (2d) 131332, ¶ 31. Here, plaintiff cannot show that but for Gordon's actions, he would have been successful in the underlying post-decree custody proceedings.

¶ 17     In count I of her motion filed in March 2015, Nancy alleged that it was in Matthew's best interest that the trial court suspend plaintiff's parenting time because he: (1) created an environment meant to marginalize and deteriorate the relationship between Matthew and Nancy, (2) refused to communicate with Nancy regarding Matthew's care, (3) created false expectations for Matthew, (4) discussed his and Nancy's divorce litigation with Matthew and blamed Nancy for the breakdown of their marriage, (5) encouraged Matthew's beliefs that he would live with plaintiff, (6) reported Nancy to the police for child endangerment for taking Matthew's iPod away, (7) encouraged Matthew to isolate himself from Nancy, (8) usurped Nancy's parenting time, (9) encouraged Matthew to contact him daily and spend hours on the telephone while in Nancy's care, (10) did not encourage communication between Matthew and Nancy, (11) encouraged Matthew to isolate himself from peers and his community, (12) supported Matthew's decision not to attend school in December 2014, and (13) Matthew was consistently hostile toward Nancy following his visitation weekends with Mark.

¶ 18     Plaintiff insists that he would have returned Matthew to Nancy if Gordon had advised him to do so. Even assuming, *arguendo*, that Gordon advised plaintiff to keep Matthew, his alleged

---

[2] This section has since been repealed by P.A. 99-90, § 5-20, eff. Jan. 1, 2016.

damages were not proximately caused by this advice.

¶ 19    At his deposition, plaintiff testified regarding "Matthew's decision not to go home with his mother on August 17," as follows:

"Q. And the police told you it was a matter for the Court to decide. They weren't going to force [Matthew] to get in mom's car?

A. Right

Q. And that allowed you to take the position that you weren't going to put him in mom's car either?

A. I couldn't put him in mom's car. He wasn't going to go."

Q. Well, you're his – you're the father of a 14-year-old.

A. And – he wasn't going to listen to me at that point. He wasn't going to go.

Q. It's not – so you're saying that the most you can do to force Matthew to go home with his mother is to tell him. And if he says no, that's the end of the conversation?

A. At that date, at that time, the police officer also agreed that Matthew did not feel safe, so he didn't feel that it was a good idea to put Matthew in the car and take him home. He wasn't gonna help me do it. And Matthew wasn't going – going to do it.

Q. So the decision not to return on the 17th was Matthew's decision?

A. It wasn't my decision. It was his decision.

Q. It was Matthew's decision not to go home with his mother on August 17?

A. Yes.

Q. And you went along with that decision. You did not do anything to force Matthew to go with his mother?

A. I tried everything I could do. And I would have been able to pick him up and

7

force him and throw him in the car. And he had told everybody that if that happens, he's going to jump out of the car. And the police officer recommended, clearly, that this child not be taken home. That he stay here at the house and let the courts decide.

Q. Okay.

A. And plus, Belle Lind Gordon had told me to keep him there."

¶ 20    The record establishes that plaintiff primarily relied on Matthew's wishes in failing to return him to Nancy and realized that his conduct would have serious consequences. At most, Gordon's alleged advice was one of many factors that he considered in making this decision.

¶ 21    Significantly, plaintiff's parenting time with Matthew was not suspended until weeks after the events of August 17. In reaching its decision, the court emphasized detailed findings in Matthew's February 2013 604(b) custody evaluation, including the following:

> Matthew's clinical psychologist, Dr. Grossman "expressed some significant concern . . . of a pathological enmeshment in which Mark has isolated Matthew from peers and peer-related activities and, instead, monopolizes all of Matt's time when with him. She further developed the opinion, based upon Matthew's report, that Mark does not feel that peer relationships are important to Matthew and that Mark has quite overtly expressed to Matthew that his mother wanted the divorce, has broken up their family, and, as such, Matthew should live with him full time in Franklin Grove. * * * She has been very disturbed by Mark's distorted view of her work with Matthew and inaccurate perceptions of what she has stated to Matthew. She believes Mark has intentionally sabotaged the therapy and has established an unhealthy alignment with Matthew against his mother, which has had an observable negative impact on Matthew's relationship with Nancy."

> "Dorothy Johnson, who had been the child's guardian ad litem, expressed concern regarding Mark's tendency to isolate Matthew and interfere with opportunities for same-age peer socialization. She expressed further concern that Mark has been manipulative of Matthew, often creating alignment between them against mom and setting up mom to either acquiesce in Mark's request for deviation from the parenting plan or be the bad guy and refuse the request."

> "And then the evaluator herself, Dr. Wilner, goes on to opine that, since the time of the couple's physical separation, it is this evaluator's opinion that Mark has developed and fostered a pathological enmeshment with Matthew such that Matthew has been encouraged to emotionally align with Mark around saving the

8

family and encouraging Nancy to reconcile her marriage. * * * This symbiotic reliance of Matthew has deepened Matthew's perception that he can only be happy in Franklin Grove with his father in wide open spaces and does not feel comfortable with his mom in Evanston."

¶ 22    The court was also troubled by two e-mails that plaintiff sent to Nancy and several others prior to the date on which Gordon began representing him. In an e-mail dated September 16, 2014, plaintiff explained that he felt Matthew "has been in crisis for several years and now feels abandoned by his mother because it appears she has misled him in many ways." In an e-mail dated July 31, 2015 (which the court noted was "filled with a great deal of hyperbole") plaintiff asserted that "[n]o matter how much you do everything in your power towards Matthew to live with you in Evanston, he will simply never agree to that. My fear is that he will permanently reject you if this struggle goes on much longer."

¶ 23    The court explained that "[t]his child – and he is a child, he's not a grownup – for years has been behaving in ways that are certainly less than acceptable. He's been given power that he should have not have. He has not been disciplined . . . and [plaintiff] sits there and acts as though he has nothing to do with [Matthew] when it is clear to anyone who's paying attention, this court included, that it's all part of his plan. Indeed, the past is prologue. It's happening again. In fact, it's never stopped. Mark's systematic campaign with Matthew to interfere with and undermine not only the boy's relationship with his mother but his entire life. His goal, Mark's goal, is to obtain custody through whatever means possible which, in this case, include insidious means of emotional manipulation of both Matthew and Nancy. The psychological term is 'pathological enmeshment.'."

¶ 24    At his deposition, Matthew's child representative opined that the trial judge "would not have suspended [plaintiff's] parenting time if the child went to high school. She might have ordered counseling. She might have assessed fees. There's a lot of things she could have done. But it's

9

pretty clear from the record that the reason that she suspended [plaintiff's] parenting time was because she felt that it was contributing to the child not going to high school." Tellingly, even plaintiff agrees that "if Matthew would have agreed to attend Evanston High School, chances are, there would have been no basis or reason for suspending [his] visitation . . ."

¶ 25      Even in the light most favorable to plaintiff, the record conclusively establishes that plaintiff's visitation was suspended because of his persistent efforts to alienate Matthew from Nancy and his failure to appropriately address Matthew's refusal to attend high school. Plaintiff's self-serving interpretation of the evidence does not create a genuine issue of material fact. See *Village of Glenview v. Northfield Woods Water & Utility Co., Inc.*, 216 Ill. App. 3d, 40, 47 (1991).

¶ 26      Plaintiff complains about various other actions taken by Gordon, including her alleged *ex parte* conversations with Matthew and her failure to negotiate for fewer expenses to be paid by plaintiff or her "failure to properly conduct the emergency hearing so as to minimize the damages that [plaintiff] was about to suffer, including the wrath of the presiding Judge . . .".  We find that plaintiff's "damages" were not proximately caused by Gordon's negligent advice. Accordingly, the trial court did not err when it granted defendants' motion for summary judgment.

¶ 27      Finally, plaintiff argues that the trial court erred in denying his untimely request to obtain an expert affidavit, because the court "was not yet presented with 'all of the evidence' " and was "missing testimony from experts that support the breaches of the standard of care and ways that Gordon proximately caused [plaintiff's] damages." In his response to Gordon's motion for summary judgment, plaintiff requested that "he be allowed time to obtain an affidavit from an expert to opine on Gordon's breaches of the standard of care." However, plaintiff failed to name his proposed expert, explain why his expert's affidavit could not be procured in time for filing his response, or what he believed his expert would testify to if sworn, pursuant to Illinois Supreme

10

Court Rule 191(b) (effective Jan. 4, 2013).

¶ 28    The trial court has discretion to permit a continuance for discovery without strict compliance with Rule 191(b), especially where the movant is asserting that the nonmovant cannot prove a *prima facie* case. *Jiotis v. Burr Ridge Park District*, 2014 IL App (2d) 121293, ¶ 26. "[T]o demand strict compliance with Rule 191(b) before adequate discovery . . . turns Rule 191(b) from a procedural safeguard for the nonmovant into a tactical weapon for the movant." *Id.* at ¶ 29. In this case, we cannot say plaintiff did not have an adequate opportunity to conduct discovery or that Gordon used Rule 191(b) as a tactical weapon. The record reflects that the parties conducted lengthy discovery for over a year and a half, which included the production of documents, answers to interrogatories, and several depositions, before Gordon filed her motion for summary judgment. See *Brummel v. Grossman*, 2018 IL App (1st) 170516, ¶ 96 (trial court did not abuse its discretion when it denied plaintiff's request to conduct additional discovery where plaintiff's request did not comply with Rule 191(b), parties had exchanged substantial discovery, and plaintiff failed to notice depositions during the 14 months that the case was pending.) Accordingly, we find that the court did not abuse its discretion in denying plaintiff's request for additional time to obtain an expert affidavit.

¶ 29                                    CONCLUSION

¶ 30    For the foregoing reasons, we affirm the trial court's entry of summary judgment in favor of the defendants.

¶ 31    Affirmed.

11